UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

TAMMY MANCUSO,

                    Plaintiff,                    **MEMORANDUM & ORDER**
                                                  14-CV-0114 (MKB)

          v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Tammy Mancuso filed the above-captioned action seeking review pursuant to 42

U.S.C. § 405(g) of a final decision of Defendant Commissioner of Social Security denying her

application for disability insurance benefits for the period from May 28, 2009, to March 17,

2011.  Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure, claiming that the Commissioner's decision is supported by substantial

evidence and should be affirmed.  (Docket Entry No. 13.)  Plaintiff cross–moves for judgment on

the pleadings, arguing that Administrative Law Judge Margaret L. Pecoraro (the "ALJ") failed to

satisfy her duties in several aspects:  (1) the ALJ did not correctly weigh the opinions of

Plaintiff's treating physicians; (2) the ALJ failed to give proper consideration to other examining,

non-treating physicians; (3) the ALJ's assessment of Plaintiff's residual functional capacity

("RFC") was not supported by the record; (4) the ALJ improperly rejected subjective evidence of

Plaintiff's level of pain and functional limitation; and (5) the ALJ erred in concluding that

Plaintiff was able to perform her past work as an accounts payable clerk.  (Docket Entry No. 11.)

For the reasons set forth below, Defendant's motion for judgment on the pleadings is denied.

Plaintiff's cross–motion for judgment on the pleadings is granted.  The Commissioner's decision

is vacated and the Court remands the matter for further administrative proceedings.

## I.  Background

Plaintiff filed an application for disability insurance benefits with the Social Security Administration ("SSA") on December 21, 2010, claiming she became disabled on May 28, 2009, following a work-related accident which left her with injuries to her lower back, neck, left shoulder, left knee, ribs and head.  (R. 26, 35, 92–93, 108–09.)  Plaintiff's application for disability benefits was denied on March 11, 2011.  (R. 40.)  On May 21, 2011, Plaintiff timely requested a hearing before the ALJ, which was held on September 10, 2012.  At the hearing, Plaintiff amended her claim for disability to a closed period from May 28, 2009 to March 17, 2011, and acknowledged that her disability ceased as of March 18, 2011, when she returned to work.  (R. 25–26.)  At the hearing, Plaintiff testified and her attorney, Charles Wiser, made an opening statement.  (R. 24–34.)  No other testimony was presented.  By decision dated October 2, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 8–20.)  On November 8, 2013, the Appeals Council denied review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (R. 1–5.)

### a.  Plaintiff's testimony

Plaintiff is a 49-year old woman.  (R. 60, 92.)  Plaintiff has a twelfth grade education and has received a General Educational Development ("GED") certificate of high school equivalency.  (R. 28.)  In 2009, Plaintiff worked as a station agent for the New York City Transit Authority ("NYCTA").  (*Id.*)  The work was repetitive and consisted of, among other things, working in a booth in a station issuing metro cards.  (R. 29.)

On May 28, 2009, Plaintiff was working on the J Line of the New York City Subway on a rainy day, and slipped and fell down a flight of stairs at "Holey Avenue" after getting off the

train.[1]  (*Id.*)  After the incident, Plaintiff suffered from pain in her leg, buttocks, underneath her buttocks, and in her back, neck and left shoulder.  (R. 33.)  Plaintiff would attend physical therapy three times a week, and received three epidural shots in her lower back at the offices of her physician, Dr. "Steller."[2]  (R. 29–30.)  The epidural shots "helped [with the pain] for a short time," but the effects of the shots only lasted between two to three weeks, at which point Plaintiff began to experience "extreme pain."  (R. 30.)  She also received trigger point injections into the muscles in her left shoulder from her physician Dr. "Villa."[3]  (R. 30–31.)  While Plaintiff sometimes had trigger point injections in her back, as well, occasionally was unable to because she experienced "bad muscle spasms."  (R. 31.)  Plaintiff was also prescribed pain medications Vicodin, Percocet and Flexeril by physician Dr. "Clark."[4]  (*Id.*)  Plaintiff would take the medication five days out of seven because the medication caused her to "sleep all day," but it helped her pain.  (*Id.*)

Following the accident, Plaintiff was unable to "do anything," and could not walk, exercise, or roller-skate as she had been able to.  (R. 32.)  She could not sit or stand comfortably for more than five minutes, would alternate between sitting and lying down, and had trouble

---

[1]  The transcript of the hearing (hereinafter, "hearing transcript") recorded the name of the subway station phonetically.

[2]  Although the hearing transcript names the physician as Dr. "Steller," (R. 30), this appears to be a reference to Dr. Stiler, one of Plaintiff's examining physicians, as there is no record of a Dr. Steller.  The Court will hereinafter treat references to Dr. Steller to mean Dr. Stiler.

[3]  Although the hearing transcript names the physician as Dr. "Villa," (R. 30), this appears to be a reference to Dr. Avella, one of Plaintiff's treating physicians, as there is no record of a Dr. Villa.  The Court will hereinafter treat references to Dr. Villa to mean Dr. Avella.

[4]  Although the transcript names the physician as Dr. "Clark," (R. 30), this appears to be a reference to Dr. Clarke, one of Plaintiff's treating physicians, as there is no record of a Dr. Clark.  The Court will hereinafter treat references to Dr. "Clark" to mean Dr. Clarke.

sleeping because of the pain.  (R. 30–31.)  When Plaintiff sat for more than five minutes she had severe shoulder, neck and back pain, and excruciating pain underneath her buttocks area as well as sharp pain in her knee and up her leg, and when she stood for more than five minutes, she would experience pain up through her leg into her buttocks, back, and shoulder.  (R. 32–33.) Plaintiff was not able to lift anything and could not comfortably hold a pocket book or carry a shopping bag.  (R. 34.)  Plaintiff describes herself as an "absolute invalid" during this time period, and reported that she frequently cried from the pain.  (R. 32.)  When Plaintiff had to go to doctor's appointments she could not take her pain medication because she felt that she could not function or leave the house while she was on her medication.  (*Id.*)  Plaintiff reported that, as of the day of the hearing, it was still painful to touch her shoulder for "too long."  (R. 34.)

   **b.  Plaintiff's work history**

   On her Disability Report, Plaintiff indicated that she worked as a retail sales clerk from October 2000 to April 2004.  (R. 110.)  From 2004 through January 2006, Plaintiff worked in accounts payable for various companies.  (R. 28, 110, 126–127.)  Plaintiff's responsibilities in accounts payable included maintenance of sales and payroll, invoicing, resolving customer problems and complaints, managing receipts from inbound and outbound freight trucks, and updating inventory records.  (R. 28, 127.)  Plaintiff was typically required to walk two hours per day, stand and climb one hour per day, sit for seven hours per day, stoop and crouch, handle large objects, and write, type or handle small objects.  (*Id.*)  She would occasionally have to lift and carry files back and forth between a cabinet and desk over a distance of 50 feet.  (*Id.*)  On her Work History Report, Plaintiff indicated that she frequently lifted twenty pounds, but that twenty pounds was the heaviest weight she lifted.  (*Id.*)

   From May 2006 until May 28, 2009, Plaintiff worked as a station agent for the NYCTA,

where her worked required her to walk for seven hours, stand for seven hours, sit for seven and a half hours, as well as stoop and crouch. (R. 28–29, 110, 126, 128.) As a station agent for the NYCTA, Plaintiff was required to lift and carry supplies such as report logs, metro cards and money bags, and she frequently lifted twenty pounds. (R. 128.) On March 18, 2011, Plaintiff returned to work for the NYCTA as a train conductor. (R. 27.)

### c.    SSA function report

With the assistance of a legal assistant, Plaintiff prepared a Social Security Administration "function report," detailing her activities of daily living, which she signed and dated January 18, 2011.[5] (R. 116–125.) Plaintiff stated that she lives in a house with her family. (R. 116.) Her daily activities consisted of taking care of her personal hygiene, taking her medication, attending doctors' appointments and resting due to her pain. (*Id.*) Though Plaintiff could attend to some personal care, she required assistance in dressing the lower half of her body due to back pain and shoulder pain, and had to take short showers because she was unable to stand for long periods of time. (R. 117.) Her daughters helped her care for her hair "due to excruciating pain." (*Id.*) Plaintiff did not require any special help or reminders to take care of her personal needs or to take her medication. (R. 118.)

At the time she completed the form, Plaintiff was able to walk for at least one block before she needed to rest for approximately fifteen minutes before walking again. (R. 122.) She had no problem paying attention generally, but found that her pain limited her ability to complete hobbies such as reading, watching television, or attending doctor's appointments. (*Id.*) Plaintiff reported being unable to lift, stand, walk, sit and climb for long periods of time, and could not

_____

[5]  Plaintiff signed the form acknowledging that "[a]nyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law." (R. 125.)

kneel, squat, or reach with her injured shoulder at all.  (R. 121.)

Plaintiff could prepare simple meals such as sandwiches, frozen dinners, cold cereal and tea and coffee, and tries to do so daily but is sometimes prevented due to her pain.  (R. 118.)  Her boyfriend and children assisted her by cooking meals daily.  (*Id*.)  Plaintiff was unable to do any household chores or yard work, and relies on her boyfriend and children to do so.  (*Id*.)  Plaintiff listed her hobbies and interests as attending her doctors' and physical therapy appointments, watching television and resting.  (R. 120.)  Plaintiff was able to shop online, and she shopped at least once each month for ten minutes for personal items such as clothing and undergarments.  (R. 119.)  With regard to social activities, Plaintiff's family visited her at home at least once or twice monthly, and she spoke with family members on the telephone at least once each week.  (R. 120.)

Plaintiff reported that she felt pain in her neck, shoulder, lower back and lower extremities "constantly."  (R. 123–24.)  She indicated she was taking Vicodin, Flexeril, Motrin, Percocet and Rifadin, and using Thermacare Heatwraps.  (R. 124.)  This treatment relieved the pain, but the pain would resume in a matter of hours.  (R. 124.)  She indicated she attended physical therapy three times per week, and felt her daily activities were limited.  (R. 124–25.)

### d.  Medical evidence

#### i.  Central Medicine Services of Westrock

Plaintiff sought treatment at Central Medicines Services of Westrock ("CMSW"), beginning shortly after her accident and continuing through March 24, 2011, after Plaintiff returned to work.  (R. 145–239, 268–78.)  Initial records show that Plaintiff first visited Dr.

Avella on June 2, 2009,[6] complaining that she had fallen down the stairs at work on May 28, 2009 and had severe "back to chest" pain.  (R. 208.)  Plaintiff had attempted to return to work the following day but eventually went to Woodhill hospital because her pain was not bearable.  (*Id.*)  Dr. Avella referred Plaintiff to physical therapy, where she attended several sessions with physical therapists Ma Theresa Tecson and Masheil Ventura between June 6, 2009 and September 8, 2009.  (R. 163, 166, 176, 179, 186, 188, 191, 194.)

### 1.  Dr. Harold Avella

Plaintiff met with Dr. Harold Avella, M.D., a physical medicine specialist at CMSW on multiple occasions between June 2, 2009 and January 10, 2010.  (R. 146, 197–210, 213–17.)  During Plaintiff's first visit with Dr. Avella on June 2, 2009, she reported severe pain in her mid-back which radiated to her upper back, pain in her lower back and sacrum, tingling in her legs, neck pain, and a "pinched" sensation in her neck with headache.  (R. 208.)  Dr. Avella found tenderness in Plaintiff's spine, neck and shoulder, decreased sensation on the left C5-C6 dermatomes, and reduced range of motion in her back, neck, and left shoulder.  (*Id.*)  Dr. Avella directed Plaintiff not to lift, push, pull, carry, sit, stand, walk, climb, kneel, bend, reach or handle.  (*Id.*)  Dr. Avella also told Plaintiff that she should not operate machinery or a motor vehicle, or be in cold, hot or humid environments.  (*Id.*)  Dr. Avella prescribed physical therapy

---

[6]  One of Plaintiff's medical records, the second page of a note from Dr. Clarke, which appears twice in the record, bears a date of August 28, 2008.  (R. 183, 196.)  However, the first page of this record bears the date August 28, 2009, which appears to be the correct date.  (R. 182.)  The Court notes that some parts of Plaintiff's physical/occupational therapy records from CMSW, including the second page bearing the date of August 28, 2008, are repeated in full or in part throughout Exhibits 1F, 5F and 6F as they are included in the Administrative Record.

three times each week.[7] (*Id.*)

On June 16, 2009, Plaintiff had a follow up appointment with Dr. Avella. (R. 204–05, 209–10.) Plaintiff complained of difficulty sleeping, nausea, dizziness, neck and left shoulder pain, as well as headaches and earaches. (R. 204, 209.) She also reported that her medication made her sleepy. (*Id.*) On examination, Dr. Avella found that Plaintiff had decreased sensation in the C5 and C6 dermatomes, decreased ranges of motion and tenderness in the cervical spine, near her neck, and lower spine, and noted that her left shoulder was tender and exhibited a reduced range of motion. (*Id.*) Dr. Avella tested Plaintiff's deep tendon reflexes which measured 2/4.[8] (*Id.*) Dr. Avella diagnosed Plaintiff with "low back" pain, lumbar radiculopathy, cervical pain, left shoulder impingement, muscle spasms and headaches. (R. 205, 210.) Dr. Avella directed Plaintiff to continue taking Soma, Ultram (Tramadol) and attending physical therapy.[9] (*Id.*) Dr. Avella also ordered several magnetic resonance imaging (MRI) tests of Plaintiff's back and left shoulder, due to Plaintiff's severe pain, spasms, and shoulder

---

[7] Plaintiff attended several physical therapy sessions with Tecson and Ventura between June 6, 2009 and September 8, 2009. (R. 163, 166, 176, 179, 186, 188, 191, 194.) On June 9, July 2 and August 4 and 6, 2009, she experienced moderate pain and tenderness in her lower back. (R. 166, 176, 191, 194), and in her neck on August 6, (R. 166). On August 13, 2009, the physical therapist noted that the pain and tenderness in Plaintiff's lower back was mild. (R. 188). On August 24 and 27, Plaintiff was assessed with moderate to severe pain in her left shoulder and mid-back. (R. 179, 186.) On September 8, 2009, Plaintiff had mild to moderate pain in her neck and lower back, with no reported pain in her left shoulder or mid-back. (R. 163).

[8] Medical practitioners test deep tendon reflexes "to examine for abnormalities in 'muscles, sensory neurons, lower motor neurons, and the neuromuscular junction; acute upper motor neuron lesions; and mechanical factors such as joint disease.' These reflexes are often rated on a scale of zero to five, where one, two, and three, indicate normal reflexes, and zero, four and five are considered abnormal." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 258 (N.D.N.Y. 2009) (quoting Neuroexam, Deep Tendon Reflexes, http://www.neuroexam. com/content.php?p=31 (last visited Feb. 11, 2009)).

[9] The record does not indicate when these medications were first prescribed.

impingement. (*Id.*) Dr. Avella again told Plaintiff not to lift, push, pull, carry, sit, stand, walk climb, kneel, bend, reach or handle. (R. 204, 209.) Dr. Avella also again told Plaintiff that she should not operate machinery or a motor vehicle, or be in cold, hot or humid environments. (*Id.*) Dr. Avella concluded that Plaintiff was temporarily totally disabled. (R. 205, 210.) In a form Doctor's Narrative Report submitted to the State of New York Workers' Compensation board following this appointment, Dr. Avella diagnosed Plaintiff with a strain or sprain in her lumbar area, shoulder and neck, and with headache and facial pain. (R. 202–03, 206–07.)

Following his June 16, 2009 examination, Dr. Avella referred Plaintiff to Hygeia Diagnostic Imaging at MRI – CT Associates of Queens, P.C. for several MRI scans. (R. 197−201, 230−34.) In a June 24, 2009 report of an MRI of Plaintiff's cervical spine, Dr. John Athas found no evidence of compression fracture, subluxation or focal marrow abnormality. (R. 199, 233.) Dr. Athas found and that the cervical cord was normal in caliber and signal intensity. (*Id.*) He noted a midline annular tear and small disc bulge in the C4–C5 dermatomes, but no evidence of "spinal stenosis or neural foraminal narrowing." (*Id.*)

In a July 7, 2009 report of an MRI of Plaintiff's left shoulder, Dr. Athas found that mild motion artifact, and determined that there was "tendinitis at the insertion of the supraspinatus and infraspinatus tendons, mild overlying subacromial/subdeltoid edema/fluid." (R. 198, 232.) Dr. Athas also noted that he detected no rotator cuff tear, the long head of the bicep tendon was intact, and there was no evidence of fracture or dislocation and no joint effusion. (*Id.*)

In a July 24, 2009 report of an MRI of Plaintiff's thoracic spine, Dr. Athas found no evidence of compression fracture, subluxation or focal marrow abnormality. (R. 197, 231.) He also found that the thoracic cord was normal in caliber and signal intensity, and there was no abnormal epidural process visible. (*Id.*) There was also no evidence of "thoracic disc herniation,

spinal stenosis or significant neural foraminal narrowing." (*Id.*)

In his July 31, 2009 report of an MRI of Plaintiff's lumbar spine, Dr. Athas noted an "L5–S1 small broad based posterior disc bulge." (R. 200, 234.) There was no evidence of acute compression fracture, subluxation or focal marrow abnormality, and he determined that the "conus" was in normal position and signal intensity. (*Id.*) The remaining "lumbar levels" were unremarkable with no evidence of "lumbar disc herniation, spinal stenosis or significant neural foraminal narrowing." (*Id.*)

On October 27, 2009, Dr. Avella administered a series of trigger point injections of Lidocaine into Plaintiff's left shoulder and her upper and lower back. (R. 146.) Dr. Avella noted that Plaintiff tolerated the procedure well. (*Id.*) She was directed to return in two weeks for a second injection.

On January 12, 2010, Dr. Avella performed electromyogram ("EMG") and nerve condition studies ("NCV") on Plaintiff. (R. 214–17, 235–39.) Dr. Avella determined that Plaintiff had left "S1" radiculopathy. (R. 217.) Dr. Avella also found "increased insertional activity in the left lower extremity and denervation potentials with reduced recruitment in the left lower extremity." (*Id.*) He noted that Plaintiff was unable to tolerate paraspinal EMG examination due to severe spasms. (*Id.*)

### 2.   Dr. Matthew A.T. Clarke

Dr. Matthew A.T. Clarke is a family practitioner at CMSW. (R. 220.) On July 30, 2009, Plaintiff met with Dr. Clarke for an initial clinical evaluation. (*Id.*) Plaintiff complained of left shoulder, back, neck, rib and head pain as a result of her fall down the stairs on May 28, 2009, but indicated that she had not been attending physical therapy. (*Id.*) Dr. Clarke noted that Plaintiff had seen Dr. Avella and that an MRI of her left shoulder revealed tendinitis. (*Id.*)

During his examination of Plaintiff, Dr. Clarke found swelling and tenderness of the affected areas, muscle spasms and trigger points in the neck and back, and trigger points in the left arm. (*Id.*) He also noted that straight leg raising Plaintiff's leg produced pain in Plaintiff's back. (*Id.*) He prescribed pain medication and physical therapy and referred Plaintiff to an orthopedic surgeon. (R. 173, 221.) Dr. Clarke concluded that Plaintiff was restricted from lifting, pulling, carrying, sitting, standing walking, climbing, kneeling and bending. (*Id.*) He also concluded that Plaintiff had no restrictions as to reaching or handling and no "environmental restrictions." (*Id.*) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (*Id.*) In a form Doctor's Narrative Report submitted to the State of New York Workers' Compensation board following this appointment, Dr. Clarke listed Plaintiff's diagnoses as calcifying tendinitis in her shoulder, and strain or sprain in her neck and lower back. (R. 167–68, 171–72.) He identified Plaintiff's level of temporary impairment at 100%. (*Id.*)

On August 28, 2009, Plaintiff visited Dr. Clarke, complaining of neck and upper back pain and spasms, left shoulder pain with decreased ranges of motion, and headaches. (R. 182−83, 196.) Dr. Clarke examined Plaintiff and found that Plaintiff had an antalgic gait and that her neck was flexed to the left and exhibited muscle spasms, trigger points and tenderness on the left side. (R. 182.) Dr. Clarke also noted that Plaintiff's shoulder was tender and flexed and abducted to 20 degrees, her back exhibited muscle spasm, trigger points and tenderness, and flexion of the back was to 45 degrees and extension to 10 degrees. (*Id.*) Dr. Clarke diagnosed Plaintiff with left shoulder tendinitis/tendinosis and cervical and lumbar sprains/strains. (R. 183, 196.) He prescribed physical therapy and trigger point injections to the neck, left shoulder and upper back, and prescriptions of Flexeril, Relafen and Tramadol. (R.182–83.) Dr. Clarke restricted Plaintiff from lifting, pushing, pulling, carrying, sitting, standing, walking, climbing

and kneeling. (R. 183.) Dr. Clarke also concluded that Plaintiff did not have any environmental restrictions or restrictions on bending, reaching and handling. (*Id*.) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (*Id*.) In a form Doctor's Narrative Report submitted to the State of New York Workers' Compensation board following this appointment, Dr. Clarke listed Plaintiff's diagnoses as calcifying tendinitis in her shoulder, and strain or sprain in her neck and lower back. (R. 180–81.) He identified Plaintiff's level of temporary impairment at 100%. (*Id*.)

On September 25, 2009 Plaintiff saw Dr. Clarke, and complained of upper back, mid-back and lower back pain, pain in the left shoulder, cramping in her left thigh, and difficulty sleeping due to the pain. (R. 160, 169.) Dr. Clarke examined Plaintiff and found that Plaintiff's was no longer complaining of neck pain. (*Id*.) Plaintiff's flexion and abduction were 60 degrees in Plaintiff's left shoulder. (*Id*.) Plaintiff's back continued to exhibit muscle spasms, trigger points and tenderness. (*Id*.) Dr. Clarke diagnosed Plaintiff with left shoulder tendinitis/tendiniosis and cervical and lumbar strains/sprains. (R. 161, 170.) Dr. Clarke ruled out cervical and lumbar radiculopathy. (*Id*.) He prescribed to Plaintiff Flexeril, Relafen, Tramdol and continued physical therapy. (*Id*.) Dr. Clarke also referred Plaintiff to an orthopedic surgeon and requested authorization for nerve conduction studies and trigger point injections. (*Id*.) He also restricted Plaintiff from lifting, pushing, pulling, carrying, sitting, standing, walking, climbing and kneeling. (*Id*.) Dr. Clarke also found that Plaintiff did not have any environmental restrictions or restrictions on bending, reaching, or handling. (*Id*.) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (*Id*.) In a form Doctor's Narrative Report submitted to the State of New York Workers' Compensation board following this appointment, Dr. Clarke listed Plaintiff's diagnoses as calcifying tendinitis in her shoulder, and

strain or sprain in her neck and lower back. (R. 158–59.) He identified Plaintiff's level of temporary impairment at 100%. (*Id.*)

On December 3, 2009, Plaintiff had a follow up appointment with Dr. Clarke, presenting with back pain and muscle spasms, left shoulder pain, and a pinching sensation in the left side of her neck. (R. 211.) Plaintiff told Dr. Clarke that several days after receiving trigger point injections, she experienced severe muscle spasms and was taken by ambulance to Franklin Hospital where she was given a "shot of a pain killer." (*Id.*). Dr. Clarke requested EMG and NCV studies of Plaintiff's upper and lower extremities to rule out cervical and lumbar radiculopathy. (*Id.*) He also noted that Plaintiff saw an "IME" on November 13, 2009, who recommended EMG studies of her upper and lower extremities.[10] (*Id.*)

After examining Plaintiff, Dr. Clarke found that she walked with an antalgic gait, was tilted forward at the waist, appeared in distress, and sat with abnormal posture in the chair. (*Id.*) On examination of her cervical spine, he determined that she had muscle spasms, trigger points and tenderness on palpation of the bilateral trapezius muscles. (*Id.*) In her neck, Plaintiff did achieve full flexion, but extension was decreased and lateral rotation was limited. (*Id.*) On examination of Plaintiff's left shoulder, Dr. Clarke noted no tenderness to palpation of the shoulder joint, and range of motion was limited to 75 degrees in abduction and flexion, which Plaintiff stated was due to pain in the left side trapezius muscle and deltoid muscle. (R. 212.) Dr. Clarke also noted that "Hawkins" was negative and "drop arm" was negative. (*Id.*) On examination of Plaintiff's lumbar spine, Dr. Clarke noted that Plaintiff was tilted forward at 20 degrees, and was able to "forward flex to 50 degrees and extension was from negative 20 degrees

_____

[10] Dr. Clarke also reviewed the results of the MRI scans ordered by Dr. Avella.

to negative 10 degrees." (*Id.*) Dr. Clarke also noted that there were prominent muscle spasms in the left "Ms. Dorsey" muscles and the lumbar paraspinal muscles from the thoracic to the sacrum levels. (*Id.*) Plaintiff also had tenderness and muscle spasms on palpation of the rhomboid muscles. (*Id.*) "Straight leg raise test" was "negative." (*Id.*)

Dr. Clarke diagnosed Plaintiff with shoulder tendinosis/tendinitis, cervical strain/sprain, cervical degenerative disc disease, lumbar sprain/strain, and lumbar disc bulge. (*Id.*) Dr. Clarke told Plaintiff to continue physical therapy to the affected body parts three times per week. (*Id.*) Dr. Clarke also prescribed a home transcutaneous electrical nerve stimulations ("TENS") unit for pain. (*Id.*) He told Plaintiff to schedule EMG and NCV studies of the upper and lower extremities to rule out cervical and lumbar radiculopathy. (*Id.*) He instructed her to take daily doses of Flexeril, Tramadol and Relafen and he added Vicodin for break–through pain. (*Id.*) Dr. Clarke restricted Plaintiff from lifting, pushing, pulling, carrying, standing, walking, climbing, kneeling and bending. (R. 213) He did not impose any restrictions on sitting or handling. He also did not impose any environmental restrictions. (*Id.*) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (R. 212)

On June 16, 2010, Plaintiff followed up with Dr. Clarke again complaining of "intense" back pain radiating from her back to the left buttock down the left leg. (R. 147, 226, 276.) She stated she was unable to sit for more than five minutes without increased pain in the back and left leg, and complained of cramping in her left leg. (*Id.*) Plaintiff also complained of shoulder pain and decreased range of motion in the left arm, neck spasms and headaches. (*Id.*) Dr. Clarke's notes indicate that "Dr. Winiarsky advised surgery to the left shoulder," but Plaintiff preferred continuing physical therapy. (*Id.*) Dr. Clarke found that Plaintiff walked with a normal gait and a posture tilted to the right. (*Id.*) He found muscle spasms, trigger points and tenderness in

Plaintiff's neck, and found she exhibited full flexion, increased extension, and limited lateral rotation to the left and right. (*Id.*) Dr. Clarke found limited range of motion in the left and right shoulder. (R. 148, 227, 277.) On examination of Plaintiff's lumbar spine, Dr. Clarke noted that Plaintiff's range of motion was limited. (*Id.*) He found tenderness, muscle spasms, and trigger points throughout her back. (*Id.*) Plantiff was able to raise her left leg straight to 30 degrees, and "cross straight leg raise [wa]s also positive." (*Id.*)

Dr. Clarke diagnosed Plaintiff with shoulder tendinosis/tendinitis, frozen shoulder, cervical strain/sprain, cervical degenerative disc disease, lumbar sprain/strain, lumbar S1 radiculopathy, and lumbar disc bulge. (*Id.*) He referred her to Dr. Hearns for trigger point injections, to Dr. Lewin, as a "spine specialist," and to Dr. Stiler, a neurologist, to assess for post-traumatic stress migraine headaches. (R. 149, 228, 278.) Dr. Clarke directed Plaintiff to continue physical therapy. (R. 149, 228, 278.) Dr. Clarke restricted Plaintiff from lifting, pushing, pulling, carrying, standing, walking, climbing, kneeling, bending and reaching, and from repetitive motions and cold environments. (*Id.*) He did not impose any restrictions on sitting or handling, or any other environmental restrictions. (*Id.*) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (R. 212)

On August 11, 2010, Plaintiff saw Dr. Clarke and complained of back, neck, and shoulder pain, muscle spasms and pain radiating from her back to the left buttock down her left leg. (R. 145.) Dr. Clarke noted that Plaintiff had been attending physical therapy and had received trigger point injections in the back. (*Id.*) He noted that according to Plaintiff, the Vicodin was not helping her and Plaintiff requested a stronger medication. (*Id.*) Plaintiff told Dr. Clarke that she could not sit for more than five minutes without her pain increasing in the back and down her left leg, and she had cramps in her left leg. (*Id.*) He noted that Plaintiff

consulted Dr. Themistocle[11] for pain management and was expecting to start selective nerve blocks in the lumbar spine. (*Id*.) Dr. Themistocle wanted Plaintiff to undergo cervical epidural injections, but they were not approved. (*Id*.) Plaintiff complained of left shoulder pain and decreased range of motion in the left arm, neck spasms that radiated to her head and headaches. (*Id*.) Plaintiff also complained of pain in her right forearm. (*Id*.) Dr. Clarke noted that Dr. Winiarsky advised Plaintiff to undergo surgery of the left shoulder, but, Plaintiff again decided to continue physical therapy instead. (*Id*.) He notes that Plaintiff consulted with Dr. Lewin, who "did not recommend surgery to the cervical spine." (*Id*.) Dr. Clarke observed that Plaintiff walked with a normal gait. (*Id*.) In an Injury on Duty Medical Form completed for "forwarding to the workers' compensation division" following this appointment, Dr. Clarke indicated that Plaintiff had shoulder tendinosis/tendinitis, frozen shoulder, cervical strain or sprain, "R/O cervical radiculopathy," lumbar strain or sprain, and cervical degenerative disc disease. (R. 157.) Dr. Clarke directed Plaintiff not to lift, push, pull, climb, bend, reach, kneel or perform repetitive movements. (*Id.*)

On October 27, 2010, Plaintiff visited Dr. Clarke for a follow-up appointment for pain in her back, left buttock, left leg, left shoulder, right forearm, and neck spasms with associated headaches. (R. 150–52.) Plaintiff also complained of not sleeping at night due to the pain in her back and buttocks, and of being depressed because of the pain. (R. 150.) Plaintiff also complained that she had episodes of inability to raise her arms. (*Id.*) Dr. Clarke noted that Plaintiff was approved for selective nerve blocks, though she had not received them yet. (*Id.*) Dr. Clarke also noted that Plaintiff was crying during the interview, her mood was depressed and

---

[11] A Disability Worksheet prepared by M. Riganti lists a Dr. Fenar Themistole as a treating source, and noted that his "report was received and is in file." (R. 240.)

her affect was consistent with depression.  (R. 151.)

On examination, Dr. Clarke found that Plaintiff was walking with a slow gait, tilted forward.  (*Id*.)  Examination of her neck showed muscle spasms, trigger points and tenderness on palpation of the bilateral trapezius muscles.  (*Id*.)  He also noted that "full flexion was achieved, extension was decreased, and lateral rotation was full."  (*Id*.)  Examination of her shoulders indicated tenderness to palpation of the anterior shoulder joints and limited range of motion. (*Id*.)  He found her right arm to have tenderness of palpation of the medial epicondyle of the elbow, tenderness on palpation of the wrist flexors, and limited range of motion in the right shoulder.  (*Id*.)  Examination of Plaintiff's back indicated muscle spasms and tenderness of palpation of the lumbar paraspinal muscles, and tenderness and muscle spasms on palpation of the rhomboid muscles.  (*Id*.)  There was also tenderness on palpation of the lumbar paraspinal muscles and there were muscle spasms and trigger points, as well as tenderness on palpation of the S joint on the left.  (*Id*.)  Dr. Clarke found that the "straight leg raise" test was positive in the left leg at 30 degree, and the test produced pain in the right buttocks, and the pain was described as a muscle pulling sensation.  (*Id*.)

Dr. Clarke diagnosed Plaintiff with shoulder tendinosis/tendinitis, frozen shoulder, cervical strain/sprain ("rule out cervical radiculopathy"), cervical degenerative disc disease, lumbar sprain/strain, lumbar S1 radiculopathy, and lumbar disc bulge.  (R. 152.)  He advised Plaintiff to continue physical therapy to the affected body parts, and he referred her to a psychologist to assess her consequential depression.  (*Id*.)  He also renewed Plaintiff's prescriptions for Flexeril and Percocet, and directed her to continue taking Motrin as needed. (*Id*.)  He further advised Plaintiff to follow up with Dr. Hearns for trigger point injections and referred her to pain management specialists and Dr. Stiler, a neurologist for post-traumatic

migraine headaches. (*Id.*) Dr. Clarke determined that Plaintiff was temporarily totally disabled. (*Id.*) He restricted her from lifting, pushing, pulling, carrying, sitting, standing, walking, climbing, kneeling, reaching, repetitive motions and cold environments. (*Id.*)

Plaintiff next saw Dr. Clarke on February 3, 2011, complaining of back pain and muscle spasms, neck pain and muscle spasms, and left-shoulder pain. (R. 272–75.) Plaintiff reported that the Vicodin had not helped her pain, and although her epidural injections did not fully relieve her back pain, she felt good for about two weeks after the injections and she was able to move better at the waist. (R. 272.) Plaintiff had recently developed pain radiating to the left buttock and down the left leg and she felt a sensation of pressure in her back. (*Id.*) Plaintiff also stated that the first week after the epidural injection, her headaches became more persistent. (*Id.*) Plaintiff also could not sit for more than five minutes without the pain increasing "in the back and down her left leg," and she also complained that she was not sleeping at night. (*Id.*) Plaintiff was still depressed because of her pain. (*Id.*) Dr. Clarke noted that Plaintiff walked with a slow gait, tilted forward. (*Id.*)

On examination of Plaintiff's neck, Dr. Clarke found trigger points and tenderness on palpation of the left trapezius muscles, and the right trapezius muscle was loose. (R. 273.) He also noted that full flexion was achieved, extension was decreased and lateral rotation was full. (*Id.*) On examination of the left shoulder and right shoulder, Dr. Clarke found tenderness to palpation of the anterior shoulder joints and limited range of motion. (*Id.*) Plaintiff's right arm also had tenderness on palpation of the medial epicondyle of the elbow and the wrist flexor muscles. (*Id.*) On examination of Plaintiff's lumbar spine, Dr. Clarke found muscle spasms and tenderness on palpation of the lumbar paraspinal muscles, the rhomboid muscles and the SI joint on the left. (*Id.*) Straight leg raise test was positive in the left leg at 30 degrees, and produced

pain in both buttocks which was described as muscle pulling sensation. (*Id.*)

Dr. Clarke diagnosed Plaintiff with shoulder tendinosis/tendinitis, frozen shoulder, cervical strain/sprain, cervical degenerative disc disease, lumbar sprain/strain, lumbar S1 radiculopathy, and lumbar disc bulge. (R. 274.) He referred her for chiropractic treatment, and to a psychologist to asses for consequential depression. (*Id.*) He also directed her to follow up with Dr. Kogan for her second epidural injection as she had improvement after the first, and referred her to Dr. Stiler, a neurologist to asses for post-traumatic migraine headaches. (*Id.*) Dr. Clarke also refiled her prescriptions for Flexeril and Percocet and directed her to continue Motrin as needed. (*Id.*) Dr. Clarke determined that Plaintiff was temporarily totally disabled for her job as a station agent and she had an overall marked partial disability of 75%. (*Id.*) He directed Plaintiff that she was restricted from lifting, pushing, pulling, carrying anything heavier than five pounds, standing, walking for more than 20 minutes, climbing, kneeling, bending and reaching. (R. 275.) She was not restricted from sitting, reaching, handling, repetitive motions and had no environmental restrictions. (*Id.*)

On March 24, 2011,[12] Plaintiff saw Dr. Clarke again, complaining of back pain and muscle spasms, left shoulder pain and decreased range of motion in her left arm, headaches, and neck spasms that radiated up to her head. (R. 268.) He noted that Plaintiff had returned to work at NYCTA as a train conductor, was bearing the pain, but every night was using a heating pad and taking Flexeril. (*Id.*) Cold weather increased her back pain and muscle spasms. (*Id.*) He also noted that Plaintiff told him she was "not really depressed" because her mind was now

---

[12] The appointment on March 24, 2011 is outside of the time frame during which Plaintiff claims she was disabled, as Plaintiff claims disability benefits through March 18, 2011. As this medical record is contained in the report, however, the Court will include it in its discussion.

occupied with all that she is learning during conductor training classes. (*Id.*) He further noted that Plaintiff used a wheeled bag to pull her tools during training and lifted the bag with her right arm. (*Id.*) He also observed Plaintiff was walking with a faster gait. (*Id.*)

On examination of the cervical spine, Dr. Clarke found muscle spasms, trigger points and tenderness on palpation of the left trapezius muscles, and that "the right trapezius muscle was loose and that full flexion and full extension were achieved and that lateral rotation was full." (*Id.*) On examination of Plaintiff's shoulders, Dr. Clarke found tenderness to palpation of the anterior shoulder joints, and limited range of motion. (R. 269.) He also noted tenderness on palpation of the medial epicondyle of the elbow and of the wrist flexor muscles on Plaintiff's right arm, and that the range of motion in the right shoulder was also limited. (*Id.*)

On examination of Plaintiff's lumbar spine, Dr. Clarke found that Plaintiff still had less than normal flexion and extension. (*Id.*) He found muscle spasms and tenderness on palpation of the rhomboid muscles, and tenderness on palpation of the lumbar paraspinal muscles as well as muscle spasms and trigger points, and tenderness on palpation of the S1 joint on the left. (*Id.*) The straight leg raise test was positive in the left leg at 30 degrees and produced pain in both buttocks which was described as a pulling sensation. (*Id.*)

Dr. Clarke diagnosed Plaintiff with shoulder tendinosis/tendinitis, frozen shoulder, cervical strain/sprain, cervical degenerative disc disease, lumbar sprain/strain, lumbar S1 radiculopathy and lumbar disc bulge. (R. 269–270.) Dr. Clarke found that Plaintiff was partially disabled to a mild to moderate degree because she was working, and that her physical examination was not much different from prior examinations. (*Id.*) He encouraged her to continue working and referred her for chiropractic and massage therapy. (*Id.*) He also told Plaintiff to get her second epidural injection, but Plaintiff wanted to wait, in the event that she

"feels worse." (*Id.*) He told Plaintiff to continue to use Flexeril but not within eight hours before work. (*Id.*) He also informed her to discontinue Perocet while working, but to take Motrin as needed. (*Id.*) Plaintiff had no other restrictions. (*Id.*)

### 3. Dr. Michael Hearns

On September 14, 2009, September 24, 2009, September 30, 2009, October 5, 2009, and October 15, 2009, Dr. Michael Hearns, an occupational medicine and pain specialist at CMSW, cosigned six Doctor's Narrative Reports, completed by physical therapists at CMSW, to be submitted to the State of New York Workers' Compensation Board. (R. 164–65, 174–75, 177–78, 184–85, 189–90, 192–93.) Dr. Hearns listed his diagnoses as sprain/strain of the lumbar region, (Sept. 14, 2009, R. 190), back pain, (Sept. 14, 2009, R. 193), back pain, sprains/strains of the neck and lumbar region, (Sept. 24, 2009, R. 185), back and neck pain, (Sept. 30, 2009, R. 178; Oct. 5, 2009, R. 175), and sprains/strains of the neck and lumbar region, (Oct. 15, 2009, R. 165.) The forms also all stated that Plaintiff had 100% temporary impairment. (R. 165, 175, 178, 185, 190, 193.)

Plaintiff visited Dr. Hearns on July 15, 2010 and reported a history of left shoulder, back and neck pain. (R. 218–19.) Dr. Hearns concluded Plaintiff had disc bulges in her neck and back. (R. 218.) He reviewed Plaintiff's past imaging tests and recommended that Plaintiff continue physical therapy and her then current medications, and referred her to an orthopedist. (*Id.*) He noted that Plaintiff's deep tendon reflexes were graded at 2. (*Id.*) Dr. Hearns determined that Plaintiff was temporarily totally disabled and restricted her lifting, pushing and pulling. (R. 219.) He listed no restrictions on sitting, standing, walking, carrying, climbing, kneeling, bending, reaching or handling, and had no environmental restrictions. (*Id.*) Dr. Hearns determined Plaintiff was totally disabled. (*Id.*)

#### 4. Unidentified examiner

Plaintiff underwent an "initial consultation evaluation" by an unidentified examiner at CMSW.[13] (R. 222–25.) The initial consultation evaluation form lists the "referral date" as August 9, 2010. (R. 222.) Plaintiff complained of persistent neck, back and leg pain with associated weakness and numbness. (*Id.*) On examination, the examiner found Plaintiff had good general health but depressed mood, she was neurologically intact, and had an antalgic gait. (R. 223.) Plaintiff's motor strength[14] was +4/5 in the extremities, reflex testing was negative, and straight leg raising was positive on the left at 30 degrees. (R. 224–25.) Plaintiff also experienced pain when she extended her shoulder to the 60–120-degree range. (R. 225.)

#### ii. Dr. Jonathan Lewin

On June 24, 2010, Plaintiff had a consultation with Dr. Jonathan Lewin, an orthopedic surgeon at Brooklyn Premier Orthopedics. (R. 262.) Dr. Lewin recounted Plaintiff's injury and treatment history and noted that upon her fall she hit the back of head and the following day she went to Woodhull Hospital, where x–rays of her chest were taken and she was diagnosed with chest wall contusion and was sent home with pain medication. (*Id.*) He also noted the treatment Plaintiff received from Dr. Clarke and Dr. Hearns, that surgery had been recommended for her left shoulder, and that Dr. Hearns had recommended an epidural injection. (*Id.*) Plaintiff complained to Dr. Lewin of left-sided neck pain and headaches, and described the pain as a

---

[13] Although Plaintiff had been seeing physicians at CMSW since June of 2009, the form recording this visit specifically indicates it was an "initial" consultation, and appears to be with a different examiner. (R. 222.) In his August 11, 2010 notes, Dr. Clarke noted that Plaintiff had consulted with a Dr. Themistocle for pain management and a Dr. Winiarsky regarding her shoulder. (R. 145.) The Court has no information as to whether the unidentified examiner was either of these two physicians, or someone else. (R. 223.)

[14] Muscle strength is graded on a scale of 0 (complete loss of strength) to 5 (maximum strength). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00E.1.

stiffness and weakness at a level of seven out of ten. (*Id.*) Plaintiff denied any radiating pain, numbness or tingling. (*Id.*) Plaintiff also complained of constant, severe left-sided lower back pain with muscle spasms, as well as pain in the tailbone. (*Id.*) Dr. Lewin noted that Plaintiff was not able to sit for more than twenty minutes at a time, and that her pain was increased by standing and prolonged walking. (*Id.*) Plaintiff reported no pain when bending forward, and the pain radiated to the left lower extremity to the knee in the posterior aspect of her leg. (*Id.*) Plaintiff also had difficulty sleeping without any medication. (*Id.*)

On examination, Dr. Lewin noted that Plaintiff was alert, well-appearing, well-nourished and was not in acute distress. (R. 263.) He further noted that Plaintiff was neurovascularly intact with good distal pulses and good capillary refill. (*Id.*) On examination of Plaintiff's cervical spine, Dr. Lewin found tenderness to palpation with myospasm in the left cervical paraspinal muscles with associated trigger points in the trapezius muscle. (*Id.*) He noted that Plaintiff's forward flexion was 40 degrees (while 50 degrees is normal), her extension was 40 degrees (while 60 degrees is normal), her lateral bend was 25 degrees bilaterally (while 45 degrees is normal) and her rotation was 60 degrees bilaterally (while 80 degrees is normal). (*Id.*) Dr. Lewin also noted that her upper extremity strength sensation were intact bilaterally. (*Id.*) On examination of Plaintiff's lumbar spine, Dr. Lewin also found diffuse tenderness to palpation through the left lumbosacral region, and that Plaintiff's forward flexion was 30 degrees (while 60 degrees is normal), her extension was 0 degrees (while 25 degrees is normal), her lateral bend was 15 degrees (while 25 degrees is normal), and she was unable to toe and heel-walk due to pain. (*Id.*)

Dr. Lewin diagnosed Plaintiff with cervical disc bulging at C4-C5, and lumbar disc bulge at L5–S1. (*Id.*) He told Plaintiff to obtain copies of her MRIs in order to discuss treatment

options, and advised her to continue physical therapy.  (R. 264.)  Dr. Lewin determined that Plaintiff was temporarily totally disabled and advised her not to return to work.  (*Id.*)

### iii.   Dr. Sekhar Upadhyayuia

On January 11, 2011, Plaintiff saw Dr. Sekhar Upadhyayuia M.D., at Pain Solutions, to obtain a left transforaminal epidural steroid injection.  (R. 259–61.)  Plaintiff complained of pain in the left shoulder and lower back, neck and both arms.  (R. 259.)  Plaintiff's worst pain was in the left leg and down the back of her calf.  (*Id.*)  On examination, Plaintiff was in no acute distress, she was alert and fully oriented, and her memory and concentration were intact.  (R. 260.)  Plaintiff had a normal gait and was able to heel-walk backwards with some difficulty with balance.  (*Id.*)  On examination of the lumbar spine, Plaintiff had tenderness with palpation, and she experienced pain beyond 30 degrees of extension and 15 degrees of extension, and straight leg raise was positive bilaterally at 45 degrees.  (*Id.*)  Sensation was full in all extremities and deep tendon reflexes were graded as 1 in the left leg and 2 in the right leg.  (*Id.*)  Examination of the left shoulder revealed tenderness and spasticity and rotation and bending to the left increased the pain.  (*Id.*)

Dr. Upadhyayuia diagnosed Plaintiff with lumbrosacral neuritis or radiculitis, unspecified, displacement of lumbar invertebral disc without myelopathy, chronic pain, left shoulder adhesive capsultitis, left shoulder arthropathy, left shoulder rotator cuff derangement, and left cervical facet arthropathy.  (R. 260–61.)  He injected Plaintiff with the first of three left transforaminal lumbar epidural injections, and anticipated administering two more lumbar epidural steroid injections and left cervical medial branch blocks.  (R. 261.)  He also recommended to Plaintiff the possibility of manipulation under anesthesia for her left shoulder. (*Id.*)

### iv. Dr. Jerome Caiati

On February 25, 2011, Plaintiff had an orthopedic consultation with Dr. Jerome Caiati M.D. at Industrial Medicine Associates, P.C. (R. 246–49.) Plaintiff complained of headaches, cervical pain radiating to her left shoulder and lumbosacral pain radiating to her left leg. (R. 246.) On examination, Dr. Caiati found that Plaintiff did not appear to be in acute distress, her gait was normal, she could walk on heels and toes without difficulty, and she was able to raise herself from a chair without difficulty and did not need help getting on or off the exam table. (R. 247.) He also noted that Plaintiff's hand and finger dexterity was intact. (*Id*.) Dr. Caiati indicated that Plaintiff was able to cook, clean and do laundry, shower, bathe, and dress herself. (R. 246.)

On examination of Plaintiff's cervical spine, Dr. Caiati found no cervical or paracervical pain or spasm, no trigger points with flexion of 45 degrees, extension of 45 degrees, lateral flexion of 45 degrees bilaterally and rotary movements 80 degrees bilaterally. (*Id*.) Examination of Plaintiff's upper extremities, revealed a range of motion of shoulder abduction and "elevation right 100 degrees and left 100 degrees," both created lower back pain, and "internal rotation and external rotation right 80 degrees and left 80 degrees asymptomatic, and abduction right 20 degrees and left 20 degrees," and both created lower back pain. (*Id*.) Dr. Caiati also found that Plaintiff had full range of motion in her elbows, forearms, wrists and fingers bilaterally, and no joint inflammation, effusion or instability. (*Id*.) He also found "strength 5/5" in Plaintiff's proximal and distal muscles, no muscle atrophy, no sensory abnormality and reflexes that were physiologic and equal. (*Id*.)

On examination of Plaintiff's thoracic and lumbar spines, Dr. Caiati found flexion of 60 degrees, extension of 20 degrees, lateral flexion of 30 degrees bilaterally, and rotary movements

60 degrees bilaterally.  (*Id.*)  Plaintiff also complained of "low back" pain.  (*Id.*)  He also found

no spinal or paraspinal tenderness, no "SI joint" or sciatic notch tenderness, no spams, no

scoliosis or kyphosis.  (*Id.*)  Upon conducting a straight leg raise test, Dr. Caiati found that sitting

right went to 90 degrees and left to 70 degrees and resulted in lower back pain.  (*Id.*)  Dr. Caitati

also found that testing "supine right went to 45 degrees" and resulted in back pain, and that

testing left went to 20 degrees and also created back pain.  (*Id.*)  He found no trigger points.  (*Id.*)

On examination of Plaintiff's lower extremities, Dr. Caiati found that Plaintiff had full

range of motion of her hips and knees bilaterally.  (R. 248.)  He also found that her range of

motion right ankle "dorsiflexion 20 degrees and planter flex 40 degrees;" "left ankle dorsiflex

was 10 degrees and asymptomatic" and "plantar flex was 30 degrees and asymptomatic."  (*Id.*)

Plaintiff's strength was "5/5 in proximal and distal muscles bilaterally."  (*Id.*)  Plaintiff had no

muscle atrophy, no sensory abnormality, reflexes were physiologic and equal, and Dr. Caiati

found no joint effusion, inflammation or instability.  (*Id.*)

Dr. Caiati diagnosed Plaintiff with asymptomatic hypertension, which he discovered that

day, and headaches.  (*Id.*)  He advised her to see a private physician to evaluate and treat her

hypertension.  (*Id.*)  Dr. Caiati noted Plaintiff's history of cervical pain, but stated that a

diagnosis was unavailable.  (*Id.*)  He also noted Plaintiff's history of "low back" pain but stated

that a diagnosis was unavailable.  (*Id.*)  He also noted that from a musculoskeletal point of view,

Plaintiff had no restrictions for sitting, standing and walking, but she was minimally restricted

with reaching, pushing and pulling with her right and left arms due to "low back" pain.  (*Id.*)  He

also noted that she was minimally restricted with climbing due to "low back" pain radiating to

legs, and mildly restricted with bending and lifting due to "low back" pain.  (R. 249.)

###### v. Dr. Igor Stiler

Plaintiff saw neurologist Dr. Igor Stiller M.D. on March 3, 2011, at Healthquest. (R. 265.) Plaintiff complained of neck pain with bilateral cervical spinal pain radiating to the top of her head, pain in her left shoulder with arm movements, back pain in her lower lumbar spine region radiating to the lower extremities, pain in her left knee with ambulation, as well as stiffness in the cervical spine region aggravated with head movements. (*Id.*)

On examination, Dr. Stiler found the head and neck to be unremarkable and her heart to be normal. (*Id.*) He found Plaintiff to be awake, alert and oriented. (R. 266.) He also found that her language, calculation skills, and short and long term memory were intact. (*Id.*) He did not note any abnormalities with regard to Plaintiff's vision, hearing, facial movements or reflexive responses. (*Id.*) On examination of Plaintiff's cervical spine, Dr. Stiler noted bilateral "mostly left sided C3 through T2" tenderness with spasm, "right and left lateral at 55 degrees," "flexion 40 degrees and extension 30–40 degrees." (*Id.*) On examination of Plaintiff's left shoulder, Dr. Stiler found tenderness in the anterior left shoulder enhanced with abduction "against resistance beyond 120 degrees, flexion beyond 100 degrees and rotation beyond 45 degrees." (*Id.*) On examination of Plaintiff's lumbar spine, Dr. Stiler found bilateral "mostly left sided L3 throughout S1" tenderness with spasm, "flexion of 55–60 degrees, extension of 20 degrees, and straight left raise right and left of 60 degrees." (*Id.*) All muscle exams were normal, the sensory exam revealed reduction in "pinprick and light touch sensation diffusely involving the left upper and left lower extremity," deep tendon reflexes were "2/4 bilaterally in the upper and lower extremities and the plantar responses were flexor bilaterally," and Plaintiff's coordination was normal. (R. 267.)

Dr. Stiler diagnosed Plaintiff with post-traumatic cephalgia ("headaches most likely

cervicogenic"), traumatic cervical radiculopathy; traumatic lumbar radiculopathy, traumatic derangement of the left shoulder, and traumatic derangement of the left knee. (*Id.*) Dr. Stiler determined that Plaintiff was temporarily totally disabled. (*Id.*)

### e. Residual functional capacity assessment by M. Riganti[15]

M. Riganti completed a Residual Functional Capacity Assessment report of Plaintiff, dated March 4, 2011. (R. 253–58.) Riganti concluded that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (R. 255–56.) Riganti concluded that Plaintiff was able to occasionally lift or carry up to twenty pounds, frequently lift or carry 10 pounds, stand or walk with breaks for about 6 hours in an 8 hour workday, sit with breaks for a total of about 6 hours in an 8 hour workday. (R. 254.) Riganti determined that Plaintiff had no push or pull limitations except the lift or carry limitations. (*Id.*) In reaching this conclusion, Riganti relied on: (1) Plaintiff's examination with Dr. Caiati, which showed she had a normal gait without an assistive device and asymptomatic high blood pressure; (2) Dr. Caiati's findings regarding Plaintiff's range of motion on her spine, shoulders, hips, knees and ankles; (3) x-rays which showed Plaintiff's left spine was "straightening" and "left shoulder negative;" (4) Dr. Clarke's August 2010 determination that Plaintiff had normal gait; (5) the January 2010 EMG which revealed S1 radiculopathy; and (6) the July 2009 report from Dr. Athas indicating tendinitis at the insertion of the supraspinatus and infraspinatus of the left shoulder, no evidence of herniation or spinal stenosis, a C4-C5 midline tear and small disc bulge. (R. 254–55.) Riganti noted that Plaintiff reported inability to lift, stand, walk, sit or climb stairs for long periods of

---

[15] M. Riganti's first name is not in the record. M. Riganti is a "single decision maker." (R. 258.) "A single decisionmaker (SDM) is not a medical professional, [and] courts have found that an RFC assessment from such an individual is entitled to no weight as a medical opinion." *Box v. Colvin*, 3 F. Supp. 3d 27, 46 (E.D.N.Y. 2014) (quoting *Sears v. Astrue*, No. 11-CV-138, 2012 WL 1758843, at *6 (D. Vt. May 15, 2012) (collecting cases)).

time, and reported daily pain in her head, neck, shoulder and lower extremities. (R. 257.)
Riganti noted that "[b]ased on the evidence in [the] file, these statements are given partial
creditability [sic]." (R. 257.)

In response to questions on the Residual Functional Capacity Assessment report form as
to whether there were treating/examining source conclusions about Plaintiff's limitations which
are significantly different from Riganti's findings, Riganti marked "No." (*Id.*) In the following
question, asking him to explain why those conclusions are unsupported if "Yes" was marked,"
Riganti wrote that Dr. Caiati's report "reveals unrestricted sitting, standing and walking.
Minimal reaching, bending, climbing, pushing and pulling due to low back pain. Mild lifting
limitation due to low back pain." (*Id.*)

### f. The ALJ's decision

The ALJ conducted the five–step sequential analysis as required by the SSA. First, the
ALJ found that Plaintiff had not engaged in substantial gainful activity from May 28, 2009
through March 17, 2011, the day that Plaintiff returned to work. (R. 13.) Second, the ALJ found
that Plaintiff's cervical and lumbar disc bulges were severe impairments. (*Id.*) The ALJ did not
address any other impairment. Third, the ALJ determined that Plaintiff did not have an
impairment or combination of impairments that meets or medically equals the severity of one of
the listed impairments in Appendix 1 of the regulations. (R. 14.). The ALJ considered listing
1.00 for musculoskeletal impairments, and found that Plaintiff's musculoskeletal impairments
did not meet the criteria because there was:

> no evidence of nerve root compression, spinal arachnoiditis,
> lumbar spinal stenosis resulting in pseudoclaudication, inability to
> ambulate effectively as defined in 1.00B2b as having insufficient
> lower extremity functioning to permit independent ambulation
> without the use of a hand-held assistive device(s) that limits the
> functioning of both upper extremities, or inability to perform fine

and gross movements effectively as defined in 1.00B2c as an
extreme loss of function of both upper extremities.

(*Id.*)

At the Fourth Step, the ALJ concluded that Plaintiff had the RFC "to perform the full

range of sedentary work" as she "has been able to lift/carry 10 pounds frequently, sit for 6 hours

in an 8–hour workday, and stand/walk for 2 hours in an 8–hour workday," and had no significant

nonexertional limitations. (*Id.*) The ALJ noted that Plaintiff's complained-of symptoms

included intense pain and that she "could not sit or stand for more than five minutes, hold a

shopping bag or touch her shoulder." (R. 15.) However, the AJL determined that while

Plaintiff's impairments could cause the alleged symptoms, her testimony "concerning the

intensity, persistence and limiting effects of these symptoms" was not credible to the extent they

were inconsistent with the overall record. (*Id.*) In making her RFC determination, the ALJ

acknowledged the following medical evidence: the June 24, 2009 MRI showed midline tearing

and a small disc bulge at C4-C5, "but not spinal stenosis or neural foraminal narrowing;" the

MRI of Plainitff's thoracic spine in July 2009 was normal; the MRI of Plaintiff's left shoulder on

July 7, 2009 "showed tendinitis at the insertion of the supraspinatus and infraspinatus tendons,

but no rotator cuff tear;" the July 31, 2009 MRI of Plaintiff's lumbar spine "showed a small disc

bulge at one level, but was otherwise normal." (*Id.*) The ALJ also acknowledged Dr. Clarke's

examinations of Plaintiff from July 30, 2009 to March 24, 2009, "for workers' compensation

purposes," including parts of his notes from the December 3, 2009, June 15, 2010, October 27,

2010 and February 3, 2011 examinations. (*Id.*) The ALJ summarized Dr. Clarke's diagnosis of

"shoulder tendinosis, frozen shoulder, cervical strain ruling out radiculopathy, cervical

degenerative disc disease, lumbar sprain, lumbar S1 radiculopathy, and lumbar disc bulge," and

determined that Dr. Clarke concluded Plaintiff was "temporarily totally disabled from 'her job as

a station agent'" and otherwise "opined that [Plaintiff] had an overall marked partial disability of 75 percent." (*Id.*) The ALJ also acknowledged: Dr. Lewin's examination of Plaintiff on June 24, 2010 "for workers' compensation purposes," and his diagnoses that Plaintiff had cervical disc bulge at C4-C5 and lumbar disc bulge at L5-S1, (R. 16); Dr. Caiati's examination of Plaintiff on February 25, 2011 and his diagnoses that Plaintiff had a history of cervical pain and low back pain, and decreased range of motion in the left ankle with unclear etiology, and a prognosis of "stable, guarded and stable respectively," (*id.*), and; Dr. Stiler's examination of Plaintiff on March 3, 2011 and his diagnoses that Plaintiff had post-traumatic cephalgia, traumatic cervical radiculopathy, lumbar radiculopathy, derangement of the left shoulder, derangement of the left knee, (R. 17). In her conclusion, the ALJ noted that "in treating exams overall, the claimant had some limited range of motion, but also exhibited no distress, normal gait, normal deep tendon reflexes, and notes indicate that she was neurovascularly intact." (*Id.*) The ALJ also stated that "[d]iagnostic testing showed only bulges, and no herniations or stenosis," and that Plaintiff's "reported activities of daily living were also generally intact." (*Id.*) The ALJ gave no weight to M. Riganti's assessment because it "was provided by a layperson who is not an acceptable medical source." (*Id.*)

Finally, the ALJ concluded that Plaintiff could perform her past relevant work as an accounts payable clerk. (R. 17–18.) The ALJ stated that Plaintiff could not perform her past relevant work as a station agent because it required a light level of exertion and exceeded Plaintiff's residual functional capacity for sedentary work. (*Id.*) The ALJ concluded, however, that the demands of Plaintiff's work as an accounts payable clerk, "which was actually and generally performed at the sedentary level of exertion," did not exceed her residual functional capacity for sedentary work. (*Id.*) In so concluding, the ALJ relied on Plaintiff's description of

the account payable clerk duties provided in her Work History Report, (R. 126–133), and DOT code 216.481-010 ("Accounting clerk (clerical)").[16]  (R. 18.)  The ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act during the period from May 28, 2009 to March 17, 2011.  (*Id.*)

## II.  Discussion

### a.  Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  Substantial evidence requires "more than a mere scintilla."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citation omitted).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the

---

[16]  No vocational expert testified as to the requirements of an accounting clerk (clerical) position.

decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. Mar. 14, 2014);

*see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts

should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally

applied;' its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05–CV–2042,

2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (quoting *Rivera v. Schweiker*, 717 F.2d 719,

723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act (the "Act"). To be eligible for disability benefits

under the Act, the plaintiff must establish his or her inability "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated

a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit

has described the steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed. If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work. If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations. When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled. However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the

fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

Defendant moves for judgment on the pleadings, claiming that the Commissioner's decision is based upon the application of the correct legal standards and is supported by substantial evidence and should be affirmed. (Def. Mem. in Support of Def. Mot. ("Def. Mem.") 1, Docket Entry No. 14.) Plaintiff cross-moves for judgment on the pleadings, arguing that Defendant's decision should be vacated because (1) the ALJ failed to give controlling weight to Plaintiff's treating physicians' medical analysis, (2) the ALJ failed to give proper consideration the opinions of Plaintiff's other physicians, (3) the record does not support the ALJ's finding that Plaintiff retained the functional capacity to perform "sedentary" work, (4) the ALJ improperly discredited Plaintiff's testimony as to the intensity, persistence and limiting effects of her symptoms, and (5) the ALJ erred in concluding that Plaintiff was capable of performing her past work as an accounts payable clerk. (Pl. Mem. in Opp'n to Def. Mot and in Support of Pl. Cross-Mot. ("Pl. Mem.") 7–9, Docket Entry No. 11-1.) For the reasons discussed below, the Court finds that the Commissioner's decision regarding Plaintiff's disability is not supported by substantial evidence in the record, remands the matter for further proceedings.

### i. Treating physician rule

Plaintiff argues that the ALJ's determination that Plaintiff retained the residual functional

capacity to perform sedentary work was not supported by substantial evidence. (*Id.* at 7–8.)

Plaintiff contends that the ALJ erred in according Plaintiff's treating physician, Dr. Clarke, only

"some" weight, and not great weight or controlling weight. (*Id.*) Defendant argues that the

ALJ's determination was supported by substantial evidence, and that the ALJ assigned the

correct weight to Dr. Clarke's opinion, properly excluding his conclusion that Plaintiff was

disabled. (Def. Mem. 25–27.) Defendant contends that Dr. Clarke's opinions were rendered for

Plaintiff's Workers' Compensation claim "and were specifically in reference to Plaintiff's ability

to perform her job as a station agent." (Def. Mem. 26.) Defendant argues that Dr. Clarke's

February 3, 2011 opinion was simply rendered with "greater specificity" when Dr. Clarke

determined that Plaintiff had a "partial" disability, was able to carry or lift up to 5 pounds, and

could stand or walk for up to twenty minutes. (*Id.*)

"A treating physician's statement that the claimant is disabled cannot itself be

determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v.*

*Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). But a treating physician's opinion on the "nature and

severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R.

§ 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the

treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of

a treating physician is accorded extra weight because the continuity of treatment he provides and

the doctor/patient relationship he develops place[s] him in a unique position to make a complete

and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2

(2d Cir. 1983) (per curiam))); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing

treating physician rule).  A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors before determining how much weight to give a treating physician's opinion.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors).  The regulations require that the ALJ set forth the reasons for the weight he or she assigns to the treating physician's opinion.  *Halloran*, 362 F.3d at 32.  The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken.  *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

Here, the ALJ failed to discuss and provide good reasons for giving Dr. Clarke's opinion only "some weight."  The ALJ reviewed the medical record and determined that Dr. Clarke's opinion was entitled to "some, but not controlling weight, because the issue of whether a

claimant is disabled is reserved to the Commissioner . . . . [and because the opinion] was also made based on workers' compensation law, which requires a different standard than that provided for under Social Security law." (R. 15–16.) The ALJ also reasoned that the record as a whole supported her conclusion that Plaintiff was capable of performing sedentary work, thus undermining Dr. Clarke's conclusions. (R. 16.) While the ALJ appears to have considered the ways in which Dr. Clarke's early opinions were not supported in light of later medical findings, closer to the end of the closed period, the ALJ failed to acknowledge "the amount of medical evidence supporting the opinion," and the ways in which Dr. Clarke's opinion — particularly his earlier opinions — were consistent with other objective medical evidence, including Plaintiff's occupational restrictions determined by Drs. Clarke, Avella, and Hearns. *See Johnston v. Colvin*, No. 13-CV-0073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support [the] opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to [the] opinion was lacking."); *Larsen v. Astrue*, No. 12-CV-0414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspect of [the treating physician's] findings and ultimate conclusions, including the plaintiff's 2009 MRI . . . , the ALJ did not elaborate on how this evidence affected the weight accorded to [the] opinions.").

Defendant relies on *McEachin v. Astrue*, No. 08-CV-0013, 2010 WL 626820, at *10 (E.D.N.Y. Feb. 23, 2010), for the conclusion that Plaintiff's treating physicians' opinions should not be controlling. (Def Mem. 26–27.) While it is true that Dr. Clarke's "assessments of

[Plaintiff's] 'disability status' are not determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant has a 'disability' under the statute," *see Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (citing 20 C.F.R. § 404.1527(d)(1)), the fact that Dr. Clarke submitted paperwork supporting Plaintiff's worker's compensation claims alone does not undermine his medical opinions as to the nature and severity of Plaintiff's impairments, particularly to the extent Dr. Clarke's opinion is consistent with other medical evidence in the record. *See McEachin*, 2010 WL 626820, at *10 (considering the underlying findings of treating physicians despite rejecting conclusions as to disability, rendered for the purposes of workers' compensation claim); *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 418 n.5 ("[A]n opinion sent to the Worker's Compensation Board *that [a] plaintiff is 'totally disabled'* likely refers only to total disability from a particular job, and does not consider other work available in the national economy.") (emphasis added).

The ALJ's failure to address consistencies in the record is particularly troubling given the ALJ's ultimate conclusion that "the record as a whole" reflected that Plaintiff could perform sedentary work. Such failures, along with the ALJ's failure to provide "good reasons" for only affording Dr. Clarke's opinion "some weight," are grounds for remand. *See Sanders*, 506 F. App'x at 77 (Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."); *see also Halloran*, 362 F.3d at 32–33; *Coscia v. Astrue*, No. 08-CV-3042, 2010 WL 3924691, at *8 (E.D.N.Y. Sept. 29, 2010) ("However, the ALJ declined to accord [the plaintiff's treating physician's] assessment controlling, or even 'great,' weight. In making this decision, the ALJ did not take into consideration two of the relevant factors . . . . As consideration of these factors is mandatory, the ALJ's lapse mandates remand." (citations omitted)); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004)

("Factual determinations, based on the weighing of evidence, are within the ALJ's competence; however, in making these determinations, the ALJ must address the evidence on the record. . . . [T]he ALJ's failure to mention several parts of the record which contradict his conclusion constitutes error.").

In addition, the ALJ failed to consider that Dr. Avella was a treating source. A treating source is defined as a plaintiff's own "physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502. Doctors who see a patient only once or twice do not "have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians." *Shatraw v. Astrue*, No. 04-CV-0510, 2008 WL 4517811, at *10 (N.D.N.Y. Sept. 30, 2008). A doctor who has treated and evaluated the patient only a few times may be considered a treating source if "the nature and frequency of the treatment or evaluation" is typical of a patient's condition. 20 C.F.R. § 404.1502.

Dr. Avella saw Plaintiff four times, on June 2, 2009, June 16, 2009, October 27, 2009 and January 12, 2010. He examined her physically, determined the extent of her physical limitations, ordered and examined several MRI scans, administered to her a series of trigger point injections, and performed EMG and NCV tests. While a doctor who sees a patient on only one or two occasions may not be a treating physician, Dr. Avella's ongoing treatment relationship with Plaintiff is sufficient to render him a treating source. *See Snell v. Apfel*, 177 F.3d at 133 (finding physician who saw the plaintiff on three occasions over the course of six months and opined on the plaintiff's physical restrictions was a treating physician, "having [] seen [the plaintiff] on multiple occasions."); *Norman v. Astrue*, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012) ("[The ALJ]

may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." (quoting 20 C.F.R. § 404.1502)); *Khan v. Astrue*, No. 11-CV-5118, 2013 WL 3938242, at *18 (E.D.N.Y. July 30, 2013) (finding "monthly meetings from February 2010 through June 2010 were sufficient for Dr. Galal to be considered a treating physician" (citing *Avila v. Astrue*, 933 F. Supp. 2d 640, 654 (S.D.N.Y. Mar. 28, 2013) and *Newsome v. Astrue*, 817 F. Supp. 2d 111, 129 (E.D.N.Y. 2011))).

In failing to recognize Dr. Avella as a treating physician, the ALJ did not acknowledge the "length, nature, and extent of the treatment relationship" between Plaintiff and Dr. Avella, including the number of times Dr. Avella examined Plaintiff, the support for Dr. Avella's findings and consistency with the overall record, or whether Dr. Avella was a specialist. (*See* R. 15 (noting only June 16, 2009 meeting with Dr. Avella).) Furthermore, the ALJ did not state what weight she afforded Dr. Avella's opinions or findings, and gave no reason for rejecting Dr. Avella's findings as to Plaintiff's physical restrictions as assessed in his June 2009 meetings. Such failures are an additional ground for remand. *Bolden v. Comm'r of Soc. Sec.*, 556 F. Supp. 2d 152, 166 (finding that the ALJ's failure to assign any weight to the plaintiff's treating physicians' opinions required remand); *Hendricks v. Comm'r of Soc. Sec.*, 452 F. Supp. 2d 194, 201 (W.D.N.Y. 2006) ("Even when controlling weight is not accorded a treating physician's opinion, the ALJ still must describe what weight he gave to that opinion. He did not do so here and that was error."); *Pogozelski v. Barnhart*, No. 03-CV-2914, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) ("Dr. Tanzer's opinion, as the opinion of a treating physician, should have been accorded controlling weight, or if not, the ALJ was still required to apply the factors specified in the regulations concerning treating physicians, to determine the degree of weight it

deserved.  The failure to follow this rule, standing alone, requires demand." (citations omitted)).

Although it is ultimately "up to the agency, and not the court, to weigh the conflicting evidence in the record," *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration omitted), where an ALJ does not appear to have taken into consideration the factors required by the treating physician rule, the Court cannot find that the ALJ's determination is supported by substantial evidence.  *See Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014) ("[I]n identifying and resolving these conflict[s of evidence in the record], the ALJ still must apply the treating physician rule."); *cf. Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012) (treating physician's opinions need not be given controlling weight when they contradict other evidence in the record and the ALJ considered them and "provide[d] good reasons for discounting them" (alteration in original) (citations omitted)).  Because the ALJ's determination that Dr. Clarke's opinion was entitled to only "some weight" was the result of an incomplete analysis of the regulatory factors, and because she did not analyze the full extent of Dr. Avella's findings, the Court remands for a proper application of the factors set forth in the treating physician rule.  Upon remand, after an examination of a fully developed record, if the ALJ declines to give Dr. Clarke's or Dr. Avella's medical opinions controlling weight, the ALJ should identify and discuss the factors set forth in 20 C.F.R. § 404.1527(c).

### ii.   RFC determination

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence in the record.  (Pl. Mem. 7–8.)  Plaintiff specifically argues that the ALJ did not adequately consider the records of Plaintiff's other examining physicians, instead arriving at her "own formula" to determine that Plaintiff was able to engage in sedentary work, "a conclusion which is not consistent with any medical opinion or any testimony."  (*Id.* at 8.)  Defendant argues

that the RFC determination was based on substantial evidence in the record. (Def. Mem. 22–28; Def. Reply Mem. 1–2.) Defendant contends that the ALJ properly evaluated the record and concluded that the "examination findings of her treating doctors were consistent throughout her alleged period of disability, right up to and after March 18, 2011, when Plaintiff" returned to work. (Def. Reply Mem. 2.) Relying on the fact that Plaintiff was able to work,[17] Defendant argues that the ALJ properly found that "[i]f Plaintiff could be a train conductor with her back and neck symptoms . . . she was clearly capable of performing at least sedentary work during the relevant period from May 28, 2009 to March 17, 2011." (*Id.* at 2–3.)

In determining the RFC of a claimant, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6 (S.D.N.Y. Mar. 16, 2012) (citing *Mongeur*, 722 F.2d at 1037). An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. 20 CFR 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or

---

[17] While the Defendant argues for skepticism, based on the fact that Plaintiff was able to return to work on March 18, 2011, the fact that Plaintiff was able to return to work on that date "does not, by itself, suggest that plaintiff should or could have returned to work at some earlier date." *See Sachs v. Astrue*, 567 F. Supp. 2d 423, 430 (E.D.N.Y. 2008) (noting that the plaintiff's attempts to return to work following his accident, in combination with his consistent work history prior to his accident, should have been considered in determining whether the plaintiff was able to work).

crouching), may reduce [a claimant's] ability to do past work and other work." *Id.*

The ALJ's RFC determination was not based on proper expert medical opinions. The ALJ was required to evaluate and weigh the medical findings of non–treating physicians. *See* 20 C.F.R. § 416.927(c) (noting "we will evaluate every medical opinion we receive"); 20 C.F.R. 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . , as the administrative law judge must do for any opinions from treating sources, and other nonexamining sources who do not work for us."). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) and *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

In determining that Plaintiff's residual functional capacity is to perform "the full range of sedentary work,"[18] the ALJ concluded that "the claimant has been able to lift/carry 10 pounds frequently, sit for 6 hours in an 8-hour workday, and stand/walk for 2 hours in an 8-hour workday," and that Plaintiff "has no significant nonexertional limitations." (R. 14.) In reaching this conclusion, the ALJ nominally rejected the findings of Riganti and afforded the findings of

---

[18] Sedentary work, as described by the SSA, involves work that requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting . . . [,] [j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); *see also Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 n.8 (noting that most unskilled sedentary jobs "require good use of the hands and fingers for repetitive hand-finger actions" (quoting *id.*)).

Dr. Caiati only "limited weight," while affording the opinions of the other medical authorities — namely, Drs. Clarke, Lewin, and Stiler "some weight."[19] (R. 15–17.)

The ALJ's findings that, at all times during the closed period, Plaintiff possessed the RFC to perform sedentary work is inconsistent with the findings of Drs. Avella, Clarke, Lewin, and Stiler. Although the ALJ nominally afforded Dr. Caiati only "limited weight" and rejected the findings of Riganti, the ALJ's ultimate RFC determination is in fact consistent only with their findings. This was inappropriate. First, Dr. Caiti's statement that Plaintiff was minimally restricted with climbing, and mildly restricted with bending and lifting was too "vague [a] statement [to] serve as an adequate basis for determining Plaintiff's RFC." *Hilsdorf*, 724 F. Supp. 2d at 347–8. Second, Riganti's opinion should have been properly rejected, because Riganti was only a layperson and based the opinion only on tests and examinations conducted by other physicians, not personal evaluation. *See Box*, 3 F. Supp. 3d at 46 (opinion of non-medical professional awarded "no weight as a medical opinion") (citing *Sears v. Astrue*, 11-CV-138, 2012 WL 1758843, at *6 (D. Vt. May 15, 2012) (collecting cases)); *Hildorf*, 724 F. Supp. 2d at 348 (finding that report of non-examining physician based only on reports from other physicians could not, standing on its own, support ALJ's RFC determination). Yet it appears as though the ALJ *did* rely heavily on Riganti's opinion, as it is the only source in the record that provides support for the ALJ's RFC determination. (*See* R. 254 (finding Plaintiff can frequently lift or

---

[19] The ALJ did not consider the findings of Dr. Hearns or Dr. Upadhyayu. However, when a court is able to "glean the rationale of an ALJ's decision," the ALJ need not "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012) (quoting *Monguer v. Heckler*, 722 F.3d 1033, 1040 (2d Cir. 1983)). In light of the conclusion that the ALJ otherwise failed to properly evaluate Plaintiff's RFC, the Court declines to address whether failing to consider the findings of these two examining physicians was error.

carry 10 points, stand or walk with breaks for about 6 hours in an 8 hour workday, and sit with breaks for a total of about 6 hours in an 8 hour workday).)  The remainder of medical evidence in the record that explicitly considers Plaintiff's ability to sit, walk and stand occasionally, and restrictions on lifting and carrying, are the records of Drs. Clarke, Avella, Lewin each of which indicated that for a period of time, Plaintiff had significant restrictions as to how long she could sit, (*e.g.*, R. 145, 157, 183, 204, 208, 209, 221, 228, 262), was not permitted to lift or carry, and, even as late as February 3, 2011, was only able to lift or carry up to five pounds and walk up to 20 minutes, (R. 275).  By failing to support the RFC determination with proper medical evidence, the ALJ committed legal error, warranting remand.  *Hilsdorf*, 724 F. Supp. 2d at 348 (finding that there was not substantial evidence supporting the ALJ's RFC determination as there was no opinions from the plaintiff's treating physician, and no RFC assessment from "any other proper source" and characterizing the opinion of the disability analyst as "not entitled to any weight"); *cf. Whitney v. Astrue*, No. 09-CV-0484, 2010 WL 3023162, *4 (W.D.N.Y. July 29, 2010) ("The ALJ's reliance on the vague opinions of a non-treating consultative physician [in reaching his RFC determination] does not constitute substantial evidence . . . .").  Because there is no medical evidence supporting the ALJ's RFC determination, the Court remands this case pursuant to 42 U.S.C. § 405(g) for further proceedings.

### iii.   Remaining arguments

Plaintiff argues that the ALJ erred in finding that the Plaintiff was not credible as to the intensity, persistence, and limiting effects of her impairment.  (Pl. Mem. 8.)  Plaintiff further argues that the ALJ's conclusion that Plaintiff could perform her past relevant work as an accounts payable clerk was flawed because the ALJ (1) failed to consider Plaintiff's description of the past work, and (2) failed to elicit testimony from a vocational expert.  (Pl. Mem. 8–9.)

"Generally speaking, it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) (quoting Carroll v. *Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). While SSA regulations require an ALJ "to take the claimant's reports of pain and other limitations into account, he or she is not required to accept the claimant's subjective complaints without question." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (alteration omitted) (quoting *Genier*, 606 F.3d at 49). Rather, the ALJ evaluates the claimants' contentions of pain through a two-step inquiry. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," including pain. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). "If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Campbell*, 465 F. App'x at 7 (alteration in original) (quoting *Genier*, 6060 F.3d at 49). At the second stage, the ALJ must first consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012). To the extent that a claimant's allegations of pain "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry."[20] *Meadors v. Astrue*, 370 F. App'x 179,

---

[20] In conducting the credibility inquiry, the ALJ must consider the following seven factors:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the

184 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(iv)).

As the Court has found that the ALJ's RFC determination is not supported by substantial evidence, the ALJ is directed to reevaluate her credibility determination on remand. *See Sanders*, 506 F. App'x at 78 n.5 (where the ALJ's credibility determination was based on his RFC finding, the court directed the ALJ to reassess his credibility determination in light of the court's finding that the FRC finding was not supported by substantial evidence). Furthermore, because the Court remands this case for further explanation of the ALJ's RFC assessment to determine whether it is supported by substantial evidence, the Court is unable to consider Plaintiff's remaining arguments as both of the errors identified impact the Court's review of Plaintiff's remaining arguments.

## III. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied and Plaintiff's motion for judgment on the pleadings is granted. The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

                                     _____ s/ MKB _____
                                     MARGO K. BRODIE
                                     United States District Judge

Dated: March 30, 2015
      Brooklyn, New York

---

                  pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.
*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).